5:22mj76-MJF

## AFFIDAVIT IN SUPPORT OF
## AN APPLICATION FOR A SEARCH WARRANT

I, Kevin Whittle, being first duly sworn, hereby depose and state as follows:

### INTRODUCTION AND AGENT BACKGROUND

1.      I make this affidavit in support of an application under Rule 41 of the Federal Rules of Criminal Procedure for a search warrant authorizing the examination of property—four electronic devices—described in Attachments A-1, A-2, A-3, and A-4, which are currently in the possession of law enforcement officers, and the extraction from that property of electronically stored information described in Attachment B and B-4.

2.      I am a Special Agent with the Drug Enforcement Administration (DEA), currently assigned to the Tallahassee Resident Office.  I have been employed with DEA for approximately 24 years. Prior to joining DEA, I worked as a Deputy Sheriff with the Geneva County Sheriff's Department for approximately eight years. Before that, I was a Police Officer with the Montgomery, Alabama Police Department for approximately two years. During and before my employment as a DEA Special Agent, I have received specialized training in narcotic investigations and have participated in many cases involving search warrants. My duties include the investigation of criminal violations under Title 21 of the United States Code, and I have participated in countless such investigations over the course of my 24 years with the DEA.

RCVD USDC FLND PC
DEC 16 '22 AM 11:21

3.    I have participated in investigations involving the interception of wire communications, the interception of electronic communications, the use of video surveillance, and the debriefing of cooperating defendants. I am familiar with the manner in which narcotics traffickers and money launderers conduct their business, including but not limited to, their methods of importing and distributing controlled substances, the structures of their organizations, their use of cellular telephones and related technologies, and their use of numerical codes and coded and/or cryptic language, words, and references to conduct their transactions.

4.    The facts set forth in this affidavit are based on my own personal knowledge; knowledge obtained from other individuals during my participation in this investigation, including other law enforcement officers; interviews of cooperating witnesses; my review of documents and records related to this investigation; communications with others who have personal knowledge of the events and circumstances described herein; and information gained through my training and experience. Because this affidavit is submitted for the limited purpose of establishing probable cause in support of the application for a search warrant, it does not set forth each and every fact that I or others have learned during the course of this investigation.

5.    Based on the facts set forth in this affidavit, there is probable cause to believe that Steven R. Webster and others, have been involved in a conspiracy to

2

distribute controlled substances, in violation of Title 21 U.S.C. §§ 841(a)(1) and 846. There is also probable cause to search the electronic devices described in Attachment A-1 through A-4 for evidence of these violations as described in Attachment B and B-4.

**IDENTIFICATION OF THE DEVICE TO BE EXAMINED**

6.    The property to be searched ("the Devices") are described in Attachments A-1, A-2, A-3, and A-4 and consist of three cellphones (A-1 through A-3) and a GPS tracking device (A-4). Device #1 is a black Apple iPhone in a clear case; Device #2 is a light pink Apple iPhone; Device #3 is a black Blu brand cellphone; and Device #4 is a Tracki brand GPS device. Photographs of the Devices may be found in Attachment A-1 through A-4. The Devices were seized during the arrest of Steven R. Webster on November 8, 2022. The applied-for warrant would authorize the forensic examination of the Devices for the purpose of identifying electronically stored data particularly described in Attachment B and B-4.

**PROBABLE CAUSE**

7.    Steven R. Webster is an attorney in Georgia (admitted 1992). The Georgia Bar website indicates that Webster is employed with The Webster Firm PC, 1140 Old Peachtree Road Suite C, Duluth GA 30097. The Webster Firm PC website indicates that it focuses on residential real estate matters. The website also

mentions the firm accepting corporate/LLC matters, injury and contract litigation, bankruptcy matters, divorce and child custody/support matters, and immigration matters. The firm's website identifies Webster as Attorney/CEO and says, "With more than 30 years of experience, Steven has a history grounded in a broad range of representation in real estate matters, wills and trusts, injury and contract litigation, divorces and child custody disputes, landlord/tenant issues, new corporation/LLC formations, and bankruptcy matters." The firm website does not mention anyone in the firm handling criminal matters. A search of the Florida Bar's website shows that Steven R. Webster is not admitted in the State of Florida. A CM/ECF search shows that Steven Webster does not practice in the United States District Court for the Northern District of Florida. As shown below, Webster was arrested in Jackson County, Florida in possession of trafficking quantities of methamphetamine and is linked to other significant drug-traffickers. These search warrants seek permission to search his three cellphones for evidence of said drug-trafficking through the use of a filter team, and to search his GPS device for evidence of said drug-trafficking.

Drug-trafficking by Rob Howell and Christine Jones-Howell

8.    Intelligence indicates Robert a.k.a. "Rob" Howell and Christine Jones-Howell distribute multiple pounds of crystal methamphetamine per week from their residence located at 2765 Wheellock Way, Marianna, Florida. For

4

instance, on October 3, 2022, a confidential source (CS#1) whose identity is known to Your Affiant, spoke with law enforcement. CS#1 is a drug trafficker and drug user from the Marianna, Florida area who has known Robert Howell since childhood. CS#1 stated that Robert Howell and Christine Jones-Howell are the main crystal methamphetamine sources of supply in Jackson County, Florida. CS#1 estimated he/she has purchased approximately two kilograms of crystal methamphetamine from Robert Howell since 2013. CS#1 provided additional information about other drug-traffickers who are known to Your Affiant from a long-term investigation into the Jackson/Calhoun/Gadsden County area and her information about those other drug-traffickers was accurate.

9.      On October 3, 2022, Agents and Investigators used CS#1 to conduct a controlled purchase of approximately one ounce of crystal methamphetamine from Robert Howell at the residence of Robert and Christine Jones-Howell located at 2765 Wheelock Way Marianna, Florida. The purchase was video and audio recorded. During the transaction, Christine Jones-Howell provided Robert Howell a plastic bag. Robert Howell then placed the crystal methamphetamine into the bag.   Christine Jones-Howell had a silver in color handgun visible at her side during the transaction.

10.     On November 3, 2022, Ashley Albert was arrested by the Jefferson County Sheriff's Office for possession of approximately 0.8 grams of crystal

methamphetamine. During a post-Miranda interview, Albert told Investigator Wren Johnson that on October 30 or 31, 2022, she contacted Christine Jones-Howell and asked her if they were "good," referring to if the Howells were currently in possession of drugs, Christine Jones-Howell confirmed to Albert that they currently had drugs. Albert did not specify how much she wanted to purchase. Albert then traveled to the Howell's residence. Albert provided Investigator Johnson with 2765 Wheellock Way, Marianna, Florida as the address she traveled to. Upon arriving at the Howell's residence, Albert observed that the crystal methamphetamine was already separated into one-ounce Ziplock-style bags referred to as "zips." Albert observed Christine Jones-Howell remove four "zips" from underneath the bed in the Howell's bedroom. Albert could not observe the type of container Christine Jones-Howell removed the "zips" from. Albert paid $1,000 for four ounces of crystal methamphetamine. Albert said while she was at the residence, she learned that just prior to her arrival the Howell's sold two pounds of crystal methamphetamine in less than one hour.

Stop of Stephen Webster on November 8, 2022

11.    On November 8, 2022, a law enforcement team comprised of agents with the Drug Enforcement Administration Tallahassee Resident Office, investigators with the Jackson County Sheriff's office, investigators with the Calhoun County Sheriff's office, and Troopers with the Florida Highway Patrol

established surveillance in the vicinity of the Howell's residence at 2765 Wheellock Way, Marianna, Florida.

12.    At approximately 1:49 P.M. CST, Jackson County Sheriff's Office (JCSO) Investigator Jake Daffin observed a black Ford F-150 travel south on the driveway leading to 2765 Wheellock Way, Marianna, Florida (towards the Howell's residence).

13.    At approximately 2:34 P.M. CST, surveillance observed the black Ford F-150 travel north on Wheellock way (away from the Howell's residence) and arrived at State Correctional Road where it continued to travel north.

14.    At approximately 2:35 P.M. CST, JCSO Investigator Sgt. Dylan Jackson and Calhoun County Sheriff's Office (CCSO) Investigator Scotty Norris observed the vehicle arrive at the intersection of US Highway 90 and State Correctional Road. The vehicle then travelled west on Highway 90 to the intersection of US Highway 231 in Cottondale, Florida where it turned left and traveled south. Surveillance units observed the vehicle displaying Georgia license plate number CTM8785. Georgia license plate CTM8785 is registered to Steven Ryan Webster of 1000 White Birch Way, Lawrenceville, Georgia on a Ford F150 Supercrew pick-up truck, black in color.

15.    At approximately 2:46 P.M. CST, JCSO Investigator Sgt. Dylan Jackson and CCSO Investigator Scotty Norris observed the vehicle arrive at the

Loves truck stop located at 2510 Highway 231, Cottondale Florida and park at a gas pump facing west in the direction of US Highway 231. Surveillance units observed a Georgia driver license photograph of Steven Ryan Webster and identified Webster as the driver and sole occupant of the vehicle. Webster exited the vehicle and entered the store while the investigative team maintained visual contact with the vehicle. After a few minutes, Webster exited the store, approached the vehicle and remained in or around the vehicle for approximately 30 minutes, still parked at a gas pump.

16.    At approximately 3:32 P.M. CST, Webster departed Loves and drove the vehicle across Dilmore Road to the Inland gas station located at 2556 Hwy 231 Cottondale, Florida (note that Dilmore Road is oriented east and west between the Loves truck stop and the Inland gas station). Webster parked in front of the Inland, exited the vehicle and approached a food truck parked off the northeast corner of the Inland gas station facing Dilmore. Webster appeared to conduct a legitimate transaction with the cashier at the food trailer.

17.    At approximately 3:40 P.M. CST, Webster departed the business and travelled south on US Highway 231 through Alford, Florida.

18.    At approximately 3:48 P.M. CST, FHP Trooper C.R Bethea was traveling southbound on US-231(State Road 75), just north of Reedy Creek Road, and observed a black in color Ford F-150 (GA Tag# CTM8785) traveling south on

8

US-231 in the inside lane. Trooper Bethea queried the aforementioned Georgia tag number through NCIC/FCIC which returned to a 2012 Ford F-150 registered to a Steven Ryan Webster. Webster's Georgia driver license number (DL# 021657330) was attached to the NCIC/FCIC query, and Trooper Bethea queried it as well. NCIC/FCIC returned with Webster's picture attached and stated his driver license status (both commercial and non-commercial) was suspended. After reviewing the picture attached to Webster's driver license query, Trooper Bethea pulled along the passenger side of the truck, in the outside lane, and observed Webster driving the vehicle. Webster glanced in Trooper Bethea's direction, giving him a view of his face and then immediately turned his head towards the driver side window, apparently refusing to look at Trooper Bethea. After positively identifying Webster as the driver, Trooper Bethea slowed his patrol vehicle and fell in behind the Ford. Trooper Bethea then activated his emergency lights to conduct a traffic stop on the vehicle. The vehicle pulled over onto the west shoulder and came to a stop.

19.    After stopping, Trooper Bethea exited his patrol vehicle and began to approach the F-150 on the passenger side. As Trooper Bethea approached, Webster could be seen through the back glass reaching into the backseat floorboard, appearing to be manipulating items in the backseat floorboard. As Trooper Bethea reached the back-passenger side window, Trooper Bethea tapped on the window and asked Webster to roll down the window because the window had tint that

9

hindered Trooper Bethea's view of the interior. Webster rolled down the window. After confirming that the interior of the vehicle did not have other occupants, Trooper Bethea approached the front passenger window. Webster rolled the window down and handed Trooper Bethea his drivers' license and Trooper Bethea explained to him the reason for the traffic stop. Webster appeared to have no knowledge of his driver license being suspended. Trooper Bethea noticed that as Webster looked for the documents Trooper Bethea requested (i.e. registration and insurance), Webster's hands were shaking. Trooper Bethea also observed Webster's shirt rising and lowering at a rapid pace, indicating that Webster had fast rapid breathing. After retrieving his insurance on his phone, Trooper Bethea asked Webster to exit the vehicle. Webster complied and exited the vehicle where a consensual weapon pat down of his person was conducted. After relocating to the front of Trooper Bethea's patrol vehicle, Trooper Bethea reviewed the insurance information for the truck on Webster's cell phone. Trooper Bethea then returned to his patrol vehicle to complete the documents and queries necessary to complete the traffic stop.

20.    K-9 Trooper N. Cabe was on scene at the time this encounter took place. While Trooper Bethea began to complete the above necessary paperwork and queries, K-9 Trooper Cabe deployed his K-9 Kane for a free air sniff of the vehicle. After completion of the K-9 sniff, Trooper Cabe advised that K-9 Kane

10

had positively alerted to one of his trained odors. K-9 Kane is trained to detect the odors of cocaine hydrochloride, cocaine base, heroin, methamphetamine and MDMA, indicating the presence of one of those substances. At that time, Webster was detained in double-locked handcuffs, searched, and secured in the backseat of Trooper Bethea's patrol vehicle. Trooper Cabe, Trooper G. Ah Sam, and Trooper Bethea conducted a probable cause search of the vehicle.

21.    During the search, the following items were found. On the passenger seat was a black in color pill container with individual daily containers labeled Sunday thru Saturday. Inside the "Sunday's" container, the officers found a few pills and a white crystal-like substance (later confirmed to be methamphetamine). Inside the center console was a clear baggie of a white crystal-like substance (later confirmed to be methamphetamine), $4,279 of U.S. currency, a black container with drug paraphernalia (apparent pipes used for smoking methamphetamine), and an Ice Breakers container with a white crystal-like substance (later confirmed to be methamphetamine). In the backseat floorboard, partially shoved under the backseat, was a gray in color range bag. Inside the bag was a container with a white crystal-like substance (later confirmed to be methamphetamine), a scale, and numerous ziplock bags of different sizes. Located in the backseat passenger side floorboard, partially under the front passenger seat, was a brown Plantronics cardboard box. Inside the box were two mason jars with a clear liquid inside

11

(unknown substance discussed below). Also located in the backseat floorboard was a large white in color scale. Located in the bed of the truck, inside a brown luggage bag, was another mason jar with a clear liquid inside (unknown substance discussed below), a large torch lighter and a large black in color scale. Inside a black zipper bag, inside the above brown luggage bag, was two LSD patches wrapped in tin foil, three pills (Qty. 1 Entresto sacubitril 24 mg, Qty. 1 Carvedilol 3.125 mg, Qty. 1 Furosemide 20 mg) and three air tags.

22.    The following items were field tested via TruNarc by Trooper Ah Sam: (3) Mason Jars with clear liquid with a positive result for 1,4-BUTANEDIOL (Scan numbers: 1011, 1013, 1015), all crystal-like substance were tested with a positive result for methamphetamine (Scan Numbers: 1017, 1020, 1022, 1024). The total weight of the methamphetamine was 117.70 grams including the weight of the evidence bags.

23.    1,4-BUTANDEDIOL is a controlled substance analogue of GHB if intended for human consumption. However, Your Affiant suspects that the mason jars contain liquid methamphetamine. Since being opened for testing by FHP, the jars have largely crystalized, which would be consistent with being liquid methamphetamine. DEA laboratory analysis is pending.

24.    Webster was placed under arrest on state charges. Webster was transported to the Jackson County Sheriff's Office and then to the Jackson County Jail by Trooper Ah Sam.

25.    Webster's truck was impounded at the Jackson County Sheriff's Office. Prior to the vehicle being impounded it was inventoried. During the inventory of the vehicle investigators recovered the following items:

      a. Three cellular telephones (Device #1, Device #2, and Device #3);

      b. a GPS tracking device (Device #4);

      c. A laptop computer; and

      d. A computer tablet.

26.    The inventory items were initially maintained in evidence storage at the Jackson County Sheriff's Office for safekeeping and have subsequently been transferred to the Drug Enforcement Residence Office in Tallahassee, Florida.

Webster's connection to other drug traffickers

27.    DEA began investigating Webster and learned that he is connected to Mauricio Velazquez-Escorza, who has been stopped with liquid crystal methamphetamine in the past.

28.    On October 17, 2021, agents with the DEA Dothan, Alabama office intercepted communications over a federal court-authorized wiretap indicating that an unknown individual would be traveling to Eddie Wayne Hutto's residence near

Black, Alabama. Surveillance located and surveilled a Gray Buick Lesabre as it traveled to Hutto's residence. Upon departing Hutto's residence, the vehicle was surveilled to 220 Gilley Road, Dothan, Alabama where agents observed the driver enter the residence. A short time later, agents observed the unknown male driver retrieve a red book bag from the Buick and re-enter the residence. A short time later, agents observed the unknown male exit the residence and put something inside the vehicle and walk back into the residence. At approximately 5:50 P.M., agents observed the unknown male re-enter the vehicle and travel north on U.S. Highway 231 and cross the Montgomery County line where it was stopped by law enforcement. The driver was then identified as Mauricio Velazquez-Escorza.

29.    Velazquez-Escorza provided consent to search the vehicle. During the search officers located a red book bag containing two kilograms of cocaine hydrochloride, five cellular telephones, a computer tablet, $28,800 U.S. currency and a handgun. In the trunk officers discovered five five-gallon buckets containing approximately forty-five kilograms of suspected liquid methamphetamine. Velazquez-Escorza was arrested and placed in the Montgomery city jail for Conspiracy to Possess with Intent to Distribute Methamphetamine. Velazquez-Escorza subsequently bonded out of jail.

30.    On February 11, 2022, as a result of intercepted communications over a federal court-authorized wiretap, agents learned that Mauricio Velazquez-

Escorza sent a text message to the subject of the wiretap which included the address 1438 Ridgecrest Lane SE, Smyrna, Georgia. Agents surveilling 1438 Ridgecrest Lane SE, Smyrna, Georgia observed a black Audi S5 displaying Georgia license plate CST4711 parked in the driveway. Georgia license plate CST4711 is registered to Steven Ryan Webster and is assigned to a black 2011 Audi S5. Agents surveilling the subject of the wiretap investigation followed him to 1438 Ridgecrest Lane. Agents then observed Velazquez-Escorza and an unknown female enter the black Audi and depart the residence with Velazquez Escorza driving. Agents observed Velazquez Escorza turn in and out of numerous parking lots, as if he was trying to avoid or detect law enforcement surveillance, until visual contact was lost and could not be re-established.

31.    On February 24, 2022, agents conducted a controlled acquisition of four kilograms of crystal methamphetamine fronted from Velazquez-Escorza by a Cooperating Defendant at Velazquez-Escorza's residence located at 1331 S. Watford Road, Slocomb, Alabama. Following the meeting where Velazquez-Escorza fronted the crystal methamphetamine, the Cooperating Defendant later told agents Velazquez Ezcorza showed him/her a conversion lab in Velazquez Ezcorza's residence that he used to convert liquid methamphetamine into crystal methamphetamine. Following the meet, agents conducted surveillance of Velazquez-Escorza as he departed his residence driving the black Audi S5

displaying Georgia license plate CST4711 (registered to Steven Ryan Webster). Velazquez-Escorza traveled to the Dollar General Market located at 140 N. Kelly Road, Slocomb, Alabama. Upon Velazquez-Escorza's departure from the Dollar General, he was stopped by law enforcement authorities and arrested. Agents seized two cellular telephones and $7000 cash from the black Audi.

32.    On the same day, a State of Alabama search warrant was executed at Velazquez-Escorza's residence and a liquid-to-crystal methamphetamine conversion lab, three five-gallon buckets of suspected liquid methamphetamine, four firearms, and eight cellular telephones were seized.

33.    Post-Miranda, Velazquez-Escorza explained that the vehicle belonged to his attorney and Velazquez-Escorza was borrowing the vehicle. Velazquez-Escorza also admitted he owed an unknown subject in Texas approximately $100,000 for the items seized during the October 17, 2021, traffic stop described above.

34.    Toll analysis has revealed that phone number (678) 300-1229 is subscribed to Steven Webster, 3330 Highgate Drive NE, Duluth GA 30097 (this is the same telephone number and address that Webster provided on his Pre-Trial Release Information sheet following his arrest in Jackson County). Historical telephone toll analysis indicates this telephone number, (678) 300-1229, has communicated with Eddie Wayne Hutto, DOB: 01/31/1966. Hutto is a codefendant

with Velazquez-Escorza in United States District Court for the Middle District of Alabama (MDAL) case number 1:22cr215 for conspiracy to distribute 50 grams or more of methamphetamine.

35.    A review of CM/ECF for the MDAL shows that Steven Webster does not represent either Velazquez-Escorza or Hutto in their MDAL case.

36.    This same telephone number, (678) 300-1229, has also communicated with Christopher Lee Benefield 110 times between October 15, 2022, and October 29, 2022. Benefield is a known drug-trafficker. DEA Panama City purchased multiple ounces of methamphetamine from Benefield approximately two months ago. Benefield was also present at Michael Garner's residence at 2479 Brock Road, Alford, Florida, on April 6, 2022, when a confidential source purchased approximately two ounces of methamphetamine from Michael Garner.

37.    Historical telephone toll analysis indicates this same telephone number, (678) 300-1229, has communicated with Willie Ashley, DOB: 05/22/1978. DEA records indicate that Ashley has been identified by other DEA investigations as someone who has sold pounds of methamphetamine.

38.    Historical telephone toll analysis also identified telephone number (229) 388-0082 as belonging to the Webster Law Firm. That phone number has communicated with McKevor Mulkey, DOB: 09/25/1990. DEA records indicate Mulkey was arrested on October 4, 2021, for Conspiracy to Possess With Intent to

Distribute Crystal Methamphetamine. A review of CM/ECF for the United States District Court for the Middle District of Georgia (MDGA) shows that Mulkey has pled guilty in MDGA case number 7:21cr48 and is pending sentencing. Steven Webster does not represent Mulkey in his MDGA case.

39.    Historical telephone toll analysis also identified telephone number, (470) 655-8053 as belonging to the Webster Law Firm. That phone number has communicated with Qwanus Jadura Blackwell, DOB: 10/06/1975. DEA records indicate that Blackwell has been identified in other investigations as a cell head and broker for an Atlanta-based source of supply for cocaine. Phone number (678) 300-1229 has also communicated with Blackwell.

40.    Historical telephone toll analysis shows that this same phone number, (470) 655-8053, has communicated with Christopher Parker, DOB: 02/14/1973. DEA records indicate Parker was arrested October 10, 2022, in Greensville, Tennessee for Conspiracy to Possess With Intent to Distribute Crystal Methamphetamine. Historical telephone toll analysis indicates that Parker has also communicated with (678) 300-1229.

41.    Your Affiant notes that while the Webster Law Firm does mention taking on immigration matters, Your Affiant investigated and learned that Ashley, Hutto, Mulkey, Blackwell, and Parker are all United States citizens.

18

## Summary

42.    In summary, Steven Webster was stopped with several ounces of crystal methamphetamine, which in Your Affiant's training and experience is indicative of drug trafficking and is inconsistent with an amount possessed for personal use. Webster was also in possession of three mason jars of an unknown liquid which Your Affiant suspects to be liquid methamphetamine. Webster had the four Devices in his vehicle when he was stopped with the methamphetamine and suspected liquid methamphetamine.

43.    Mauricio Velazquez-Escorza is a significant drug-trafficker who is pending prosecution in the United States District Court for the Middle District of Alabama. On October 17, 2021, Velazquez-Escorza was caught with five five-gallon buckets of suspected liquid methamphetamine (approximately 45 kilograms). On February 24, 2022, agents found a conversion lab for liquid methamphetamine and three five-gallon buckets of suspected liquid methamphetamine in Velazquez-Escorza's residence. On two separate occasions, February 11, 2022, and February 24, 2022, Velazquez-Escorza was seen driving a car registered to Steven Webster.

44.    Eddie Wayne Hutto is a codefendant of Velazquez-Escorza and toll analysis shows that Steven Webster was also in communication with Hutto.

45.    Toll analysis also shows that Steven Webster is in communication with other known and suspected drug-traffickers.

46.    Webster is an attorney, but does not appear to have a criminal law practice that would explain his communications with these drug-traffickers. Likewise, the majority of the traffickers are United States citizens, so his communication with them would not be explained by them seeking his advice on criminal-related immigration issues.

47.    As a result, there is probable cause to believe that these communications are related to drug-trafficking. Your Affiant submits that there is probable cause to conduct the search conducted in Attachment B of the Device described in Attachment A-1 through A-3, and the search described in Attachment B-4 of the device described in Attachment A-4.

### Information about Drug Trafficking

48.    Your Affiant knows that drug-traffickers routinely conspire with their sources of supply and their routine customers. Drugs are often fully or partially "fronted" in which drugs will be provided on consignment with the expectation of payment at a later date.

49.    Your Affiant knows that drug-traffickers often maintain a stable "clean" phone that is used to communicate with friends and family, and one or more "dirty" phones which they use to communicate about drug-trafficking and

which they routinely change in an effort to thwart law enforcement detection. Here, Webster's possession of three cellphones along with trafficking quantities of methamphetamine is consistent with one or more of those cellphones being used for drug-trafficking communications. Your Affiant knows that comparison of a drug-trafficker's "clean" and "dirty" communications is often required to interpret the full picture of their criminal culpability and that drug-traffickers will often direct that communications which begin on their "clean" phone move over to their "dirty" phone, and drug-traffickers are often sloppy such that some drug-trafficking-related communications also appear on their "clean" telephones.

50.    Based on my training and experience, I know that Devices #1, #2, and #3 are "smartphones" which can allow a user to transfer photographs, videos, text communication, voicemail and contacts from one device to another. Devices #1, #2, and #3 have a built in camera capable of taking photographs and videos. Devices #1, #2, and #3 are able to access the World Wide Web or Internet. Devices #1, #2, and #3 are capable of storing telephone numbers and other contact information. In my training and experience, examining data stored on devices of this type can uncover, among other things, evidence that reveals or suggests who possessed or used the device such as logs, phonebooks, saved usernames and passwords, documents, and Internet browsing history. Devices #1, #2, and #3 can also function as a GPS.

51.    In my training and experience, many drug purchasers possess some sort of records about their illegal business transactions, often in the form of text messages, photographs, receipts, and other such records which are inadvertently maintained. These records can include types, amounts and prices of drugs as well as the dates, places and amounts of transactions that have occurred or will occur in the future.

52.    In my training and experience, drug purchasers often either intentionally or inadvertently maintain photographs, videos, or other such depictions of controlled substances or United States Currency. This may be done in an effort to establish credibility or to enhance their social position within the drug community (for instance, taking photographs of large amounts of controlled substances or cash to show off their wealth). It may also be done as part of drug transactions, where the seller will send the buyer a photograph of the controlled substance to show its quality.

53.    In my training and experience, photographs, text messages, emails, or other records which show connections between two members of a conspiracy are valuable pieces of evidence. The value of some such evidence may be immediately apparent (e.g. text messages or records discussing drug transactions, or identifying the name, address, phone number or other identifying information about the source of the drugs being sold). However, even connections which seem innocuous at the

time may be helpful in prosecuting co-conspirators when looked at from the end of an investigation (e.g. photographs which place two co-conspirators at the same place at the same time; or even simply evidence which shows that co-conspirators were friends or associates).

54.    In my training and experience, financial records are valuable evidence in both drug trafficking and money laundering investigations. Such records can help establish the lack of a legitimate source of income (or the lack of a sufficient legitimate source of income), as well as records of expenditures and the movement of money. If a lack of sufficient legitimate income is shown compared to known assets and financial transactions, it allows a jury to infer that any unexplained monetary transfers or conspicuous consumption is evidence of, and the result of, illegal activity. In my training and experience, many people have financial applications on their phone, or use their phone to log in to their banks' websites to check account balances and pay bills.

55.    Based on the facts presented and my training and experience, there is probable cause to believe that Devices #1, #2, and #3 will contain a contact list, call logs, text messages, email, Facebook or other social media applications and messages, calendar or schedule and other information that will provide evidence of the above crimes, as well as show who was using the devices during and after the time frames that the crimes outlined herein were committed.

23

## TECHNICAL TERMS

56.    Based on my training and experience, I use the following technical terms to convey the following meanings:

a. <u>Wireless telephone</u>:  A wireless telephone (or mobile telephone, or cellular telephone) is a handheld wireless device used for voice and data communication through radio signals.  These telephones send signals through networks of transmitter/receivers, enabling communication with other wireless telephones or traditional "land line" telephones.  A wireless telephone usually contains a "call log," which records the telephone number, date, and time of calls made to and from the phone.  In addition to enabling voice communications, wireless telephones offer a broad range of capabilities.  These capabilities include: storing names and phone numbers in electronic "address books;" sending, receiving, and storing text messages and e-mail; taking, sending, receiving, and storing still photographs and moving video; storing and playing back audio files; storing dates, appointments, and other information on personal calendars; and accessing and downloading information from the Internet.  Wireless telephones may also include global positioning system ("GPS") technology for determining the location of the device.

b. <u>GPS</u>:  A GPS navigation device uses the Global Positioning System to display its current location.  It often contains records the locations where it has

24

been.  Some GPS navigation devices can give a user driving or walking directions to another location.  These devices can contain records of the addresses or locations involved in such navigation.  The Global Positioning System (generally abbreviated "GPS") consists of 24 NAVSTAR satellites orbiting the Earth.  Each satellite contains an extremely accurate clock.  Each satellite repeatedly transmits by radio a mathematical representation of the current time, combined with a special sequence of numbers.  These signals are sent by radio, using specifications that are publicly available.  A GPS antenna on Earth can receive those signals.  When a GPS antenna receives signals from at least four satellites, a computer connected to that antenna can mathematically calculate the antenna's latitude, longitude, and sometimes altitude with a high level of precision.

      c.  <u>IP Address</u>: An Internet Protocol address (or simply "IP address") is a unique numeric address used by computers on the Internet.  An IP address is a series of four numbers, each in the range 0-255, separated by periods (e.g., 121.56.97.178).  Every computer attached to the Internet computer must be assigned an IP address so that Internet traffic sent from and directed to that computer may be directed properly from its source to its destination.  Most Internet service providers control a range of IP addresses.  Some computers have static— that is, long-term—IP addresses, while other computers have dynamic—that is, frequently changed—IP addresses.

d. <u>Internet</u>: The Internet is a global network of computers and other electronic devices that communicate with each other. Due to the structure of the Internet, connections between devices on the Internet often cross state and international borders, even when the devices communicating with each other are in the same state.

e. Based on my training, experience, and research, I know that the devices have capabilities that allow it to serve as a wireless telephone and a GPS navigation device. In my training and experience, examining data stored on devices of this type can uncover, among other things, evidence that reveals or suggests who possessed or used the devices.

## ELECTRONIC STORAGE AND FORENSIC ANALYSIS

57. Based on my knowledge, training, and experience, I know that electronic devices can store information for long periods of time. Similarly, things that have been viewed via the Internet are typically stored for some period of time on "Device" This information can sometimes be recovered with forensics tools.

58. <u>Forensic evidence</u>. As further described in Attachment B, this application seeks permission to locate not only electronically stored information that might serve as direct evidence of the crimes described on the warrant, but also forensic evidence that establishes how the "Devices" were used, the purpose of its

use, who used it, and when.  There is probable cause to believe that this forensic electronic evidence might be on the "Devices" because:

   a. Data on the storage medium can provide evidence of a file that was once on the storage medium but has since been deleted or edited, or of a deleted portion of a file (such as a paragraph that has been deleted from a word processing file).  Forensic evidence on a device can also indicate who has used or controlled the device.  This "user attribution" evidence is analogous to the search for "indicia of occupancy" while executing a search warrant at a residence.

   b. A person with appropriate familiarity with how an electronic device works may, after examining this forensic evidence in its proper context, be able to draw conclusions about how electronic devices were used, the purpose of their use, who used them, and when.

   c. The process of identifying the exact electronically stored information on a storage medium that are necessary to draw an accurate conclusion is a dynamic process.  Electronic evidence is not always data that can be merely reviewed by a review team and passed along to investigators.  Whether data stored on a computer is evidence may depend on other information stored on the computer and the application of knowledge about how a computer behaves.  Therefore,

27

contextual information necessary to understand other evidence also falls within the scope of the warrant.

d. Further, in finding evidence of how a device was used, the purpose of its use, who used it, and when, sometimes it is necessary to establish that a particular thing is not present on a storage medium.

59.    Nature of examination.  Based on the foregoing, and consistent with Rule 41(e)(2)(B), the warrant I am applying for would permit the examination of the "Devices" consistent with the warrant.    The examination may require authorities to employ techniques, including but not limited to computer-assisted scans of the entire medium, that might expose many parts of the "Devices" to human inspection in order to determine whether it is evidence described by the warrant.

60.    Manner of execution.  Because this warrant seeks only permission to examine devices already in law enforcement's possession, the execution of this warrant does not involve the physical intrusion onto a premise.  Consequently, I submit there is reasonable cause for the Court to authorize execution of the warrant at any time in the day or night.

61.    Filter team.  Steven Webster is a practicing attorney. As a result, Your Affiant anticipates that there will be attorney-client privileged and work product material on Device #1, Device #2, and Device #3. (Device #4 is a GPS device

which is not expected to contain any privileged material.) As described in Attachment B, the review of Device #1, Device #2, and Device #3 will be conducted using a filter team to avoid exposing the investigative/prosecution team to any such material.

## CONCLUSION

62.    I submit that this affidavit supports probable cause for search warrants authorizing the examination of the Devices described in Attachments A-1, A-2, and A-3 to seek the items described in Attachment B, and of the Device described in Attachment A-4 to seek the items described in Attachment B-4.

Respectfully submitted,

Special Agent Kevin Whittle
Drug Enforcement Administration

Attested to by the affiant in accordance with the requirements of Fed. R. Crim. P. 4.1 by email and telephone on this 16th day of December, 2022.

/s/ *Michael J. Frank*
MICHAEL J. FRANK
United States Magistrate Judge

## ATTACHMENT A-1

The property to be searched ("Device #1") consists of the following electronic device. Device #1 is a black Apple iPhone in a clear case. Device #1 is stored as DEA Exhibit N-31 in SSEE S001475144. Photographs of Device #1 follow:



This is the Device to be searched as described in Attachment B. The identity of the Device is known to the Affiant.

## ATTACHMENT B

### Items to be Seized

The items to be seized are all the records on the Device described in Attachment A that evidence violations of 21 U.S.C. §§ 841(a)(1) and 846 (i.e. the manufacture, distribution, possession with intent to distribute, or conspiracy to manufacture, distribute, or possess with intent to distribute controlled substances, including methamphetamine, involving Steven R. Webster ("Webster") between January 1, 2021, and November 8, 2022, and specifically:

A.   Records regarding the purchase, possession, sale, delivery, or manufacture of controlled substances;

B.   Communications regarding the purchase, possession, sale, delivery, or manufacture of controlled substances;

C.   Photographs or videos of controlled substances;

D.   Communications with or about people known to be traffickers of methamphetamine;

E.   Communications with or about Robert "Rob" Howell;

F.   Communications with or about Christine Jones-Howell;

G.   Communications with or about Mauricio Velazquez-Escorza;

H.   Communications with or about Eddie Wayne Hutto;

I.   Communications with or about Christopher Lee Benefield;

J.    Communications with or about Willie Ashley;

K.    Communications with or about McKevor Mulkey;

L.    Communications with or about Qwanus Jadura Blackwell; and

M.    Evidence of user attribution showing who used or owned the Device at the time the things described in this warrant were created, edited, or deleted, including text messages, logs, phonebooks, saved usernames and passwords, documents, and browsing history.

As used above, the terms "records" and "information" include all of the foregoing items of evidence in whatever form and by whatever means they may have been created or stored, including any form of computer or electronic storage (including any removable storage medium found in such a device, such as an SD card or a SIM card).

## Filter Team Protocol

The search of the Device will be conducted using a filter team.

## I.    Filter team membership:

Members of the filter team are not part of the investigation/prosecution team and never will be so in the future. The filter team will consist of:

- an AUSA from the United States Attorney's Office for the Northern District of Florida Gainesville or Pensacola Office ("filter team attorney");

- a legal assistant from the United States Attorney's Office for the Northern District of Florida Gainesville or Pensacola Office;

- Federal agent(s) from the Drug Enforcement Administration ("filter agent");

- a forensic examiner/computer technician, which may or may not be one of the filter agents. The forensic examiner/computer technician will be permitted to testify to the creation of new images (as described below), if necessary. In addition, if the forensic examiner/computer technician locates potentially protected material that is ultimately provided to the investigation/prosecution team as outlined below, then the forensic examiner/computer technician will be permitted to testify regarding the location and/or recovery of that material, as well as the filter procedures.

## II.  Basic procedures related to the filter team review of seized material:

A. The filter team attorney shall be responsible for documenting actions and decisions of the filter team (e.g., in a log), including but not limited to: a chain of custody for items being searched; a chain of custody for relevant material reviewed pursuant to the procedures set forth below; categorization of relevant material as described below; determinations by the court, if any; and chain of custody of material and items returned to defense counsel, if any.

B. The filter team shall not disclose the contents of any potentially protected material to any member of the investigation/prosecution team except as provided below.  **"Protected" material includes attorney-client privileged communications and attorney work product information.**

C. The filter team may ask Webster or his counsel whether a seized electronic storage device, file, or email account may contain attorney-client privileged or attorney work product material ("protected material").

If Webster or his counsel states in writing that an electronic storage device, email account, or file does not contain either attorney-client privileged or attorney work product material, then no further filter review is required.

D. The filter team shall err on the side of caution and treat any questionable items as potentially protected materials.  In addition:

    1. The filter team shall treat as potentially protected any letter, e-mail, memorandum, or other document containing a communication between Webster (or his agents) and one of his attorneys.

    2. The filter team shall treat as potentially protected any letter, e-mail, memorandum, or other document containing a communication between Webster (or his agents) and one of his clients.

    3. The filter team shall treat as potentially protected any letter, e-mail, memorandum, or other document containing a communication between Webster and employees of his lawfirm.

    4. Webster is employed by the Webster Firm, P.C.  The following individuals are known employees of the Webster Firm, P.C.:
        a. Jason Mccart
        b. Crystal Richardson
        c. Allison Criswell
        d. Hillary Taylor
        e. Kathy Betances
        f. Rachel Webster
        g. Julie Uburtis
        h. Kat Maddox
        i. Amy Wilby
        j. Mike Wilby
        k. Ashleigh Scheel
        l. Caitlin Cox

E. Filter team members should be familiar with the legal elements of the attorney-client privilege and the attorney work product doctrine.

F. Consultation with investigative agents and/or prosecutors: During the review process, the filter team may rely on descriptions from the

investigative agents and/or prosecutors concerning the facts of the investigation, and the scope of the warrants, to assist in its determinations as to the seizure of any document, file, or item, or any other legal question. However, members of the filter team shall not disclose the substance of any Privilege Review Material (as defined below) to any member of the investigation/prosecution team except in accordance with (III)(B), (III)(C)(2)(1), and (III)(C)(4) below.

G. Except as provided below for redacted material, the filter agent shall place all material determined to be privileged or work product protected (protected material) into a secure container marked "protected information," and return it to Webster or his counsel or segregate it, as appropriate. The filter team attorney shall maintain an electronic or manual log detailing the nature of the documents returned or segregated, and the process by which protected materials were stored, protected, and/or returned to defense counsel.

H. The forensic examiner/computer technician provides responsive materials and/or segregates information at the request of the investigation/prosecution team and/or filter team. Any determinations made about what may or may not be provided to the investigation/prosecution team must be made by the filter team members. Forensic examiners/computer technicians shall not share or discuss what they learn with anyone outside the team for which they are working on a particular matter, and shall be instructed to refrain from discussing the substance of the materials reviewed with the investigation/prosecution team, unless approved by the filter team attorney.

I. Items to be reviewed: The filter team will review all responsive seized material before disclosing to the investigation/prosecution team. The filter team will ensure that review pursuant to this protocol is conducted before any material determined to be responsive to the search warrant is turned over to the investigation/prosecution team. The filter team may elect at any time to cease privilege review of any material determined not to be responsive to the search warrant, and any such unreviewed nonresponsive material will also be segregated and kept from the investigation/prosecution team. Only material that has been reviewed, found to be responsive to the search warrant, and not subject to segregation as potentially privileged under the protocol will be turned over to the investigation/prosecution team. However, as discussed above,

the filter review may be limited or not necessary if Webster or his counsel indicates in writing that certain physical records or electronic storage devices do not contain protected materials.

## III. Filter team review procedures:

A. The filter agent will work with the filter team attorney to identify, as to material responsive to the search warrant, all protected and potentially protected materials on the electronic storage devices.

B. After the filter team has located all protected and potentially protected materials on the electronic storage devices, the forensic examiner/computer technician then will either (1) create new images of the electronic storage devices that do not contain any protected or potentially protected materials, or (2) place the files that do not contain any protected or potentially protected materials on a new digital media (e.g., a DVD) (collectively "New Media"). This process can be done on a rolling basis. The forensic examiner/computer technician then will provide the New Media to the investigation/prosecution team who will locate material on the New Media that is responsive to the search warrant.

C. The forensic examiner/computer technician and filter agent will continue to work with the filter team attorney in the review of the protected and potentially protected materials.

1. For that protected and potentially protected material that is not responsive to the search warrant, the filter team will segregate and not disclose that material to the investigation/prosecution team.

2. For that protected and potentially protected material that is responsive to the search warrant, the filter agent and filter team attorney will segregate it into four categories: (1) not protected; (2) protected and cannot be redacted; (3) protected but can be redacted; and (4) potentially protected (e.g., the government does not have sufficient information to make that determination, or an exception to the applicable protection, such as crime-fraud or waiver by disclosure to a third party, may apply). The filter team attorney will send a copy of the material in categories 3 (with proposed redactions) and 4 (collectively "Privilege Review Material"), along with the bases for

determinations that any potentially protected materials are subject to an exception, to Webster or his counsel, along with a log.[1]

3. The filter team attorney will work with Webster or his counsel to try to reach an agreement as to whether the Privilege Review Material: (1) falls within an exception to the applicable protection, or (2) can be redacted to eliminate the protected information. If the filter team attorney and Webster or his counsel cannot agree on these determinations, the filter team attorney will submit those items to the court for determinations regarding protection and/or proposed redactions of the material.

4. The filter team attorney only will provide Privilege Review Material to the investigation/prosecution team if: (i) the filter team and counsel for Steven R. Webster reach an agreement as to the item; or (ii) the court has ruled that the filter team attorney may provide the item to the investigation/prosecution team.

D. No member of the filter team shall disclose the contents of any Privilege Review Material retrieved from the electronic storage devices to members of the investigation/prosecution team except in accordance with (III)(C)(4) directly above.

---

[1] The log shall include the file name, the type of file, the file date, the creation date, the medium on which the file is located, the sender and recipient (if applicable), and the subject matter.